1

2                                                    O

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11

12                                   )
                                     )  Case No. SACV 12-1608
13   PEREGRINE                       )  JGB (ANx)
     PHARMACEUTICALS, INC.,          )
14                                   )
                                     )  ORDER GRANTING IN PART
15                   Plaintiff,      )  AND DENYING IN PART
                                     )  DEFENDANT'S MOTION FOR
16        v.                         )  PARTIAL SUMMARY JUDGMENT
                                     )
17                                   )
     CLINICAL SUPPLIES               )
18   MANAGEMENT, INC.,               )
                                     )
19                                   )
                     Defendant.      )
20   _____ )

21

22        Before the Court is Defendant's motion for partial

23   summary judgment.  (Mot., Doc. No. 35.)  After

24   considering the papers filed in support of and in

25   opposition to the Motion, and the arguments presented

26   at the July 28, 2014 hearing, the Court GRANTS IN PART

27   and DENIES IN PART the Motion.

28

                                     1

# I.   BACKGROUND

On September 24, 2012, Plaintiff Peregrine Pharmaceuticals, Inc. ("Plaintiff" or "Peregrine") filed a Complaint against Defendant Clinical Supplies Management, Inc. ("Defendant" or "CSM").  (Compl., Doc. No. 1.)  The Court granted the parties' stipulation to stay the case for 120 days beginning on March 8, 2013 to allow them to participate in a dispute resolution process required by contract.  (Doc. No. 11.)

On March 28, 2014, Plaintiff filed the operative First Amended Complaint which states five causes of action for: (1) breach of contract; (2) negligence; (3) negligence per se; (4) negligent misrepresentation/concealment; and (5) constructive fraud.  ("FAC," Doc. No. 26.)

On June 5, 2014, Defendant filed a motion for partial summary judgment.  (Mot., Doc. No. 35.)  In support of the Motion, Defendant attached:

- Memorandum of Points and Authorities (Mot.);
- Statement of Undisputed Facts ("SUF," Doc. No. 35-1);
- Declaration of Matthew L. Marshall ("Marshall Decl.," Doc. No. 2);
- Declaration of Jennifer Lauinger ("Lauinger Decl.," Doc. No. 35-3);

1  
2

- Compendium of Exhibits ("Comp.," Doc. No. 35-4) including Exhibits A through G;[1] and

3  
4

- Request for Judicial Notice ("RJN," Doc. No. 35-5) attaching Exhibits A and B.[2]

5  
6

On June 23, 2014, Plaintiff opposed the Motion (Opp'n, Doc. No. 38), attaching:

7  
8

- Statement of Genuine Disputes of Fact ("SGI," Doc. No. 38-4);

9

10

_____

11  
12  
13

[1] Due to the volume of evidence filed in support of and in opposition to the Motion, the Court does not enumerate each attached Exhibit, but describes the documents in subsequent evidentiary citations as needed.

14  
15  
16  
17  
18  
19  
20  
21

Prior to filing the Motion, Defendant applied to file Exhibits C to G of the Compendium under seal. (Doc. Nos. 31-32.)  On May 29, 2014, the Court granted in part Defendant's application finding that compelling reasons existed to seal the documents insofar as they contained confidential financial information of the parties.  (Doc. No. 34.)  Because Defendant had not articulated a sufficient factual basis justifying sealing the remainder of the documents, the Court ordered Defendant to publicly file redacted versions of the exhibits redacting only confidential financial information.  (Id.)  In this Order, the Court considers the sealed versions of Exhibits C through G, including the redacted financial information, insofar as necessary.

22  
23  
24  
25  
26  
27  
28

[2] In its RJN, Defendant requests the Court take judicial notice of the First Amended Complaint and Answer filed in this action.  (See generally RJN.)  Although the court may take judicial notice of its own records, it is unnecessary for Defendant to file a request for judicial notice of a pleading that has been filed in this action.  Therefore, the requests will be DENIED as unnecessary.  See Martinez v. Blanas, No. 2:06-CV-0088 FCD DAD, 2011 WL 864956, at *1 n.1 (E.D. Cal. Mar. 10, 2011) (denying request for judicial notice of the complaint as unnecessary as it is "a part of the record in this action"); Low v. Stanton, No. CVS05 2211MCE DAD P, 2007 WL 2345008, at *7 (E.D. Cal. Aug. 16, 2007) (same).

- Declaration of John K. Landay ("Landay Decl.," Doc. No. 38-1);

- Declaration of Jeffrey Masten ("Masten Decl.," Doc. No. 38-2); and

- Declaration of Joseph S. Shan, M.P.H. ("Shan Decl.," Doc. No. 38-3).

Defendant replied on June 30, 2014 (Reply, Doc. No. 39), including its Response to Plaintiff's SGI ("Resp.," Doc. No. 40) and Objections to evidence Plaintiff submitted in support of its opposition ("Obj." Doc. No. 41).

## II.  LEGAL STANDARD[3]

A court may grant partial summary judgment to determine "before the trial that certain issues shall be deemed established in advance of the trial. The procedure was intended to avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit." Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 (9th Cir. 1981) (quotation omitted). A motion for partial summary judgment is resolved under the same standard as a motion for summary judgment.

---

[3] Unless otherwise noted, all references to "Rule" refer to the Federal Rules of Civil Procedure.

4

1   See California v. Campbell, 138 F.3d 772, 780 (9th Cir.
2   1998).

3       Summary judgment is appropriate if the "pleadings,
4   depositions, answers to interrogatories, and admissions
5   on file, together with the affidavits, if any, show
6   that there is no genuine issue as to any material fact
7   and that the moving party is entitled to judgment as a
8   matter of law." Fed. R. Civ. P. 56(c). A fact is
9   material when it affects the outcome of the case.
10  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
11  (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir.
12  1997).

13      The party moving for summary judgment bears the
14  initial burden of establishing an absence of a genuine
15  issue of material fact. Celotex, 477 U.S. at 323.
16  This burden may be satisfied by either (1) presenting
17  evidence to negate an essential element of the non-
18  moving party's case; or (2) showing that the non-moving
19  party has failed to sufficiently establish an essential
20  element to the non-moving party's case. Id. at 322-23.
21  Where the party moving for summary judgment does not
22  bear the burden of proof at trial, it may show that no
23  genuine issue of material fact exists by demonstrating
24  that "there is an absence of evidence to support the
25  non-moving party's case." Id. at 325.

26      However, where the moving party bears the burden of
27  proof at trial, the moving party must present

28

                                5

1  compelling evidence in order to obtain summary judgment
2  in its favor.  United States v. One Residential
3  Property at 8110 E. Mohave, 229 F. Supp. 2d 1046, 1047
4  (S.D. Cal. 2002) (citing Torres Vargas v. Santiago
5  Cummings, 149 F.3d 29, 35 (1st Cir. 1998) ("The party
6  who has the burden of proof on a dispositive issue
7  cannot attain summary judgment unless the evidence that
8  he provides on that issue is conclusive.")).  Failure
9  to meet this burden results in denial of the motion and
10  the Court need not consider the non-moving party's
11  evidence.  One Residential Property at 8110 E. Mohave,
12  229 F. Supp. 2d at 1048.
13       Once the moving party meets the requirements of
14  Rule 56, the burden shifts to the party resisting the
15  motion, who "must set forth specific facts showing that
16  there is a genuine issue for trial."  Anderson, 477
17  U.S. at 256.  The non-moving party does not meet this
18  burden by showing "some metaphysical doubt as to the
19  material facts."  Matsushita Elec. Indus. Co., Ltd. v.
20  Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Genuine
21  factual issues must exist that "can be resolved only by
22  a finder of fact because they may reasonably be
23  resolved in favor of either party."  Anderson, 477 U.S.
24  at 250.  When ruling on a summary judgment motion, the
25  Court must examine all the evidence in the light most
26  favorable to the non-moving party.  Celotex, 477 U.S.
27  at 325.  The Court cannot engage in credibility
28

1  determinations, weighing of evidence, or drawing of

2  legitimate inferences from the facts; these functions

3  are for the jury. <u>Anderson</u>, 477 U.S. at 255.

4

5                          **III. FACTS**

6

7  **A.   Undisputed Facts**

8

9      For purposes of this Motion, the parties do not

10 dispute any of the material facts.[4]  The following

11 material facts are sufficiently supported by admissible

12  _____

13      [4] None of the purported disputes identified in the
   SGI actually provide or cite to evidence disputing the

14 evidence propounded by Defendant.  Instead, Plaintiff
   challenges Defendant's characterization of the facts as

15 described in the SUF. (<u>See, e.g.</u>, SGI ¶¶ 8
   ("[D]isputed in part to <u>the extent</u> CSM is implying that

16 the services are not far more detailed."), 11, 24.)
   Such "disputes" are improper, and the Court relies on

17 the undisputed facts in the SUF to the extent they are
   adequately supported by the evidence. <u>See Hanger</u>

18 <u>Prosthetics & Orthotics, Inc. v. Capstone Orthopedic,</u>
   <u>Inc.</u>, 556 F. Supp. 2d 1122, 1126 (E.D. Cal. 2008);

19 <u>Contract Associates Office Interiors, Inc. v. Ruiter</u>,
   No. CIV 07-0334 WBS PAN, 2008 WL 2916383, at *5 (E.D.

20 Cal. July 28, 2008) ("[T]he court will not consider
   Contract Associates' objections to SSUF Nos. 60, 64,

21 and 75 because these objections are aimed only at
   Ruiter's characterization and purported misstatement of

22 the evidence-as represented in her SSUF-rather than the
   actual underlying evidence.").

23     Similarly, instead of disputing the evidence
   provided in the SGI, Defendant "disputes" many of

24 Plaintiff's facts by directing the Court to its
   evidentiary objections. (Resp. ¶¶ 6-7, 9-10, 13-14,

25 18, 20, 22-26, 28-32, 35-59.)  Evidentiary objections
   disguised as disputes lack merit and do not create

26 genuine issues of fact. <u>See Headley v. Church of</u>
   <u>Scientology Int'l</u>, No. CV 09-3986 DSF(MANX), 2010 WL

27 3157064, at *1 n.1 (C.D. Cal. Aug. 5, 2010), <u>aff'd</u>, 687
   F.3d 1173 (9th Cir. 2012).  Thus these facts <u>are</u>

28 similarly undisputed for purposes of this Motion.

1    evidence and are uncontroverted; they are "admitted to

2    exist without controversy" for purposes of the Motion.[5]

3    L.R. 56-3.

4        Peregrine is a clinical-stage biopharmaceutical

5    corporation that develops pharmaceuticals focused on

6    the treatment of cancer and other diseases.  (SUF ¶ 1;

7    SGI ¶ 1.)  CSM provides clinical supply management

8    services in support of clinical research programs.

9    (SUF ¶ 2; SGI ¶ 2.)

10   _____

11       [5] Without providing any argument or explanation,
     Peregrine objects to nearly every statement made in the
     Shan and Masten Declarations submitted in support of
12   the Opposition.  (Obj.)
13       As to almost every fact proffered by Peregrine, CSM
     argues that it is irrelevant and/or speculative.  (See,
14   e.g., Obj. ¶¶ 2-7, 9, 10, 13, 15-16, 18-59.)  **Error!
     Main Document Only.**"Objections to evidence on the
15   ground that it is irrelevant, speculative, and/or
     argumentative, or that it constitutes an improper legal
16   conclusion are all duplicative of the summary judgment
     standard itself" and are thus "redundant" and
17   unnecessary to consider here.  Burch v. Regents of
     Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D.
18   Cal. 2006); see Anderson, 477 U.S. at 248 ("Factual
     disputes that are irrelevant or unnecessary will not be
19   counted.").  Thus, the Court OVERRULES CSM's relevance
     and speculation objections.
20       With regard to the remaining evidentiary
     objections, the Court finds that the majority of the
21   objected-to evidence is immaterial to the issue before
     the Court and does not rely on it here.  Insofar as the
22   Court relies on evidence which CSM objects to as
     hearsay, the Court finds that that evidence could be
23   presented in an admissible form at trial and thus the
     Court may consider it in deciding the summary judgment
24   motion.  Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th
     Cir. 2003) (noting that at the summary judgment stage,
25   the Court does "not focus on the admissibility of the
     evidence's form," but rather on the admissibility of
26   its contents).  The Court also finds that as Peregrine
     employees who designed and executed the Phase II trial
27   (Shan Decl. ¶¶ 5, 8) and carried out the CSM audit
     (Masten ¶¶ 3-5), Shan and Masten have personal
28   knowledge of the facts the Court relies upon herein.

1       In 2010, Peregrine initiated a randomized, double-
2  blind, placebo controlled Phase IIb clinical trial of
3  the drug, bavituximab, on 121 late stage lung cancer
4  patients ("Phase II trial"). (SUF ¶ 3; SGI ¶ 3; Shan
5  Decl. ¶¶ 6-7.) The patients in the Phase II trial were
6  divided into three groups. (Id. ¶ 8.) The control or
7  "A" group was to receive docetaxel (chemotherapy) plus
8  a placebo. (Id.) The "B" group patients were to
9  receive 1 mg/kg doses of bavituximab plus docetaxel.
10  (Id.) The third "C" group was to take 3 mg/kg doses of
11  bavituximab plus docetaxel. (Id.)

12       Peregrine hired eight main vendors to perform the
13  necessary work for the Phase II trial. (SUF ¶ 4; SGI ¶
14  4.) Peregrine contracted with CSM to provide supply
15  chain services, including ensuring proper labeling of
16  the drug vials, distribution to the 40 sites, and
17  reconciling the product vials in inventory. (Shan
18  Decl. ¶ 13.)

19       After several rounds of revisions and negotiations,
20  on March 18, 2010, the parties fully executed the final
21  version of the Master Services Agreement ("MSA").
22  (Comp., Exh. F.) The MSA provides that the specific
23  service that CSM was to provide in the Phase II trial
24  would be set forth in greater detail in subsequent Work
25  Orders and Change Orders. (MSA ¶¶ 1, 2, 5.) The Work
26  Orders and Change Orders, when finalized and signed by
27  the parties, were subject to the MSA. (MSA ¶¶ 1.A,

28

2.A.)  In exchange for its performance of the Work and
Change Orders, Peregrine agreed to pay CSM each month
for services rendered.  (<u>Id.</u> ¶ 6.)  The MSA also
included an indemnification provision, which provided
that CSM and Peregrine would indemnify each other in
certain situations.  (<u>Id.</u> ¶ 12.)  At two points in the
MSA, CSM agreed to provide its services in compliance
with the study protocol, written instructions of
Peregrine, generally accepted standards of good
clinical practice and good manufacturing practice, and
all applicable laws, rules, and regulations, including
the Federal Food, Drug and Cosmetic Act ("FDCA") and
regulations of the Food and Drug Administration
("FDA").  (<u>Id.</u> ¶¶ 3.A, 15.)

Primarily at issue in this Motion is the section of
the MSA entitled "Limitations."  (<u>Id.</u> ¶ 16.)  In
relevant part, this section includes two Limitations on
Damages ("LOD") clauses which provide:

**16.  LIMITATIONS**

A.  Except as expressly set forth in
this agreement, CSM does not make
any warranty, express or implied,
with respect to the services or
the results obtained from its
work, including, without
limitation, any implied warranty
of merchantability or fitness for
a particular purpose.  In no event
shall CSM, or any of its
affiliates, directors, officers,
employees, consultants or agents
be liable for consequential,
incidental, special, or indirect
damages, regardless of whether it

10

has been advised of the
possibility of such damages.[6]

B.   . . .

C.   In no event will the collective,
aggregate liability of CSM and its
affiliates, directors, officers,
employees, consultants or agents under
this Agreement, the Work Orders or
Change Orders exceed the amount of
payments actually received by CSM from
[Peregrine] for the applicable Work
Order(s), including any Change
Order(s).

In order to reach the final version of the MSA, the
parties engaged in three rounds of revisions and
negotiations of contract terms.  (SUF ¶ 10; SGI ¶ 10.)
In February 2010, CSM sent a draft Master Services
Agreement to Peregrine.  ("Draft MSA," SUF ¶ 5; SGI ¶
5.)  On February 18, 2010, Peregrine sent a revised,
redlined version of the MSA to CSM, which included at
least thirty-one changes to the payment terms, the
method of preparation of Work Orders, CSM's duties with
regard to regulatory compliance, the term of the MSA,
termination and indemnification provisions, and the
choice of law and force majeure clauses.  ("Revised
MSA," Comp., Exh. C.)  The Revised MSA also deleted a
portion of Paragraph 16A which read:

In no event shall CSM, or any of its
affiliates, directors, officers,
employees, consultants or agents be
liable for consequential, incidental,
special, or indirect damages, ~~or for
acts of negligence which are not
intentional or reckless in nature,~~

---

[6] In the MSA, Paragraph 16.A was printed in all
capital letters.  (SUF ¶ 23; SGI ¶ 23.)  For ease of
reading, the Court omits the capitals in this Order.

11

1                 regardless of whether it has been
2                 advised of the possibility of such
                damages.

3 (Revised MSA ¶ 16.A.)  On February 18, 2010, Peregrine

4 also sent a "clean copy" of the Revised MSA to CSM

5 which included two additional revisions to the Draft

6 MSA, including a change to CSM's hourly rate and its

7 right to terminate the MSA.  (SUF ¶ 17; SGI ¶ 17;

8 Comp., Exh. D.)  CSM accepted all of Peregrine's

9 revisions to the MSA.  (SUF ¶ 18; SGI ¶ 18.)

10     According to Peregrine, CSM's role in the Phase II

11 trial was to receive shipments of the placebo, 1 mg/kg

12 bavituximab, and 3 mg/kg bavituximab totaling

13 approximately 8,000 vials, label them as instructed,

14 and distribute them to patient sites.  (Shan Decl. ¶

15 13.)  CSM was also supposed to keep track of the

16 administration of the doses and the patient groups

17 until the study was unblinded.  (Id. ¶ 14.)

18     Peregrine claims that in September 2012, it became

19 aware that the "A" and "B" treatment assignments may

20 have been switched during the trial.  (Id. ¶ 16.)

21 Peregrine then undertook an audit of CSM's performance

22 which allegedly revealed that all "C" group patients

23 were correctly treated, but there was evidence of vial

24 mislabeling between the placebo and 1 mg/kg groups.

25 (Masten Decl. ¶ 6.)  Peregrine contends that the

26 mislabeling implicated up to 25 percent of the placebo-

27 labeled doses and up to 25 percent of the 1 mg/kg

28

vials.  (Id.)  Based on these purported failures, Peregrine claims CSM breached the MSA and failed to comply with good clinical practices, FDA regulations, and industry standards.  (Opp'n at 5-7; FAC ¶ 19.)

## IV. DISCUSSION

CSM moves for partial summary judgment to enforce the Limitations on Damages ("LOD") clauses in the MSA and thus limit the damages sought by Peregrine in the FAC.  (Mot. at 23.)  Peregrine argues that the LOD clauses are unenforceable and no damages limitation should apply in this action.  (See generally Opp'n.)[7]

Two provisions of the MSA are relevant to CSM's arguments.  First, the second sentence of Paragraph 16.A provides: "In no event shall CSM, or any of its affiliates, directors, officers, employees, consultants or agents be liable for consequential, incidental, special, or indirect damages, regardless of whether it has been advised of the possibility of such damages." (MSA ¶ 16.A.)  In addition, Paragraph 16.C states: "In no event will the collective, aggregate liability of CSM and its affiliates, directors, officers, employees,

---

[7] The MSA states that the agreement and any applicable Work Order and Change Orders "will be construed, governed, interpreted, and applied in accordance with the laws of the State of California . . . ."  (MSA ¶ 17.)  In conformity with this provision, the parties rely on California contractual interpretation laws.  The Court similarly applies California law.

consultants or agents under this Agreement, the Work Orders or Change Orders exceed the amount of payments actually received by CSM from [Peregrine] for the applicable Work Order(s), including any Change Order(s)."  (MSA ¶ 16.C.)

Generally, "a limitation of liability clause is intended to protect the wrongdoer defendant from unlimited liability."  Food Safety Net Servs. v. Eco Safe Sys. USA, Inc., 209 Cal. App. 4th 1118, 1126 (2012) (quoting 1 Witkin, Summary of Cal. Law, Contracts, § 503 (10th ed. 2005)).  Clauses of this type "have long been recognized as valid in California."  Markborough California, Inc. v. Superior Court, 227 Cal. App. 3d 705, 714 (1991); see also Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc., 319 F. Supp. 2d 1040, 1048 (C.D. Cal. 2003) ("Under California law, parties may agree by their contract to the limitation of their liability in the event of a breach.").

**A.   Interpretation of the LOD Clauses**

"Whether an exculpatory clause covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control.  When the parties knowingly bargain for the protection at issue, the

14

protection should be afforded.  This requires an
inquiry into the circumstances of the damage or injury
and the language of the contract; of necessity, each
case will turn on its own facts." Burnett v. Chimney
Sweep, 123 Cal. App. 4th 1057, 1066 (2004) (internal
quotation omitted).  "The language of a contract is to
govern its interpretation, if the language is clear and
explicit, and does not involve an absurdity."  Cal.
Civ. Code § 1638.  Under California law,

> [t]he interpretation of a contract is
> a judicial function. . . .  In
> engaging in this function, the trial
> court "give[s] effect to the mutual
> intention of the parties as it
> existed" at the time the contract was
> executed.  [Cal.] Civ. Code, § 1636.
> Ordinarily, the objective intent of
> the contracting parties is a legal
> question determined solely by
> reference to the contract's terms.
> [Cal.] Civ. Code, § 1639 ("[w]hen a
> contract is reduced to writing, the
> intention of the parties is to be
> ascertained from the writing alone, if
> possible"); [Cal.] Civ. Code, § 1638
> (the "language of a contract is to
> govern its interpretation").

Cachil Dehe Band of Wintun Indians of Colusa Indian
Cmty. v. California, 618 F.3d 1066, 1073 (9th Cir.
2010) (citations omitted).  However, "contractual
clauses seeking to limit liability will be strictly
construed and any ambiguities resolved against the
party seeking to limit its liability . . . ." Nunes
Turfgrass, Inc. v. Vaughan-Jacklin Seed Co., 200 Cal.
App. 3d 1518, 1538 (1988); see Queen Villas Homeowners

15

1    <u>Ass'n v. TCB Prop. Mgmt.</u>, 149 Cal. App. 4th 1, 6 (2007)

2    ("[E]xculpatory clauses are construed against the

3    released party.").

4         Here, even strictly construed against CSM, the

5    clear, unambiguous and express language of Paragraph 16

6    limits CSM's liability.  The Paragraph provides that

7    "in no event" will CSM be liable for consequential,

8    incidental, special, or indirect damages, nor will its

9    collective, aggregate liability under the MSA exceed

10   the amount Peregrine actually paid to CSM.  These

11   provisions clearly limit the amount and types of

12   damages for which CSM can be liable.

13        Peregrine argues in opposition that the LOD

14   provisions are ambiguous.  (Opp'n at 11-12.)  "A

15   contract provision is considered ambiguous when the

16   provision is susceptible to more than one reasonable

17   interpretation."  <u>S. California Stroke Rehab.</u>

18   <u>Associates, Inc., v. Nautilus, Inc.</u>, 782 F. Supp. 2d

19   1096, 1110 (S.D. Cal. 2011) (citing <u>MacKinnon v. Truck</u>

20   <u>Ins. Exchange</u>, 31 Cal.4th 635 (2003)).  First,

21   Peregrine claims that Paragraph 16.A only disclaims

22   liability for breaches of express and implied

23   warranties because the sentence prior to the LOL clause

24   states that CSM does not make any warranty with respect

25   to its services.  (Opp'n at 11-12.)  However, following

26   the warranty provision, the LOD clause states that "in

27   no event" is CSM liable for consequential, incidental,

28

1   special or indirect damages.  The court in <u>Food Safety</u>
2   <u>Net Servs. v. Eco Safe Sys. USA, Inc.</u>, 209 Cal. App.
3   4th 1118, 1128 (2012), considered the same argument
4   based on nearly identical contractual provisions and
5   held that "[i]n view of this broad and unqualified
6   language, the clause must be regarded as establishing a
7   limitation on [CSM]'s liability sufficient to encompass
8   [Peregrine]'s claims . . . ."

9        Similarly, Peregrine argues that the phrase
10  "[e]xcept as expressly set forth in this agreement" is
11  ambiguous.  (Opp'n at 12.)  Once again, this language
12  is in the first sentence of Paragraph 16.A and does not
13  apply to the LOD clauses.  To the contrary, both LOD
14  clauses indicate that they apply more broadly, stating
15  that "in no event" will CSM be liable for additional
16  damages.

17       Peregrine also contends that the indemnity
18  provisions of the MSA permit unlimited recovery from
19  CSM for any property damage CSM caused.  (Opp'n at 12.)
20  The indemnification provisions provide that CSM shall
21  indemnify Peregrine and defend and hold it harmless
22  from and against any liability, loss, or damage because
23  of bodily injury or property damage arising from CSM's
24  actions or inactions under the MSA.  (MSA ¶ 12.A.)  The
25  language of this provision demonstrates that it is a
26  standard indemnity agreement by which CSM guarded
27  Peregrine against certain third-party claims; it does
28

1   not apply to claims between the contracting parties.

2   See Myers Bldg. Indus., Ltd. v. Interface Tech., Inc.,

3   13 Cal. App. 4th 949, 969 (1993) ("A clause which

4   contains the words 'indemnify' and 'hold harmless' is

5   an indemnity clause which generally obligates the

6   indemnitor to reimburse the indemnitee for any damages

7   the indemnitee becomes obligated to pay third persons.

8   [citation omitted] Indemnification agreements

9   ordinarily relate to third-party claims."); Hathaway

10  Dinwiddie Const. Co. v. United Air Lines, Inc., 50 F.

11  App'x 817, 823 (9th Cir. 2002) (holding that a standard

12  indemnity provision in a contract between general

13  contractor and project owner guarded owner against

14  third-party claims and thus did not apply to require

15  contractor to indemnify owner for claims it asserted

16  against owner).

17       Strictly construing the clauses against CSM, the

18  Court finds that the LOD clauses are unambiguous and

19  contemplate a bar on recovery of consequential,

20  incidental, special, and indirect damages as well as

21  damages in excess of the amount paid by Peregrine to

22  CSM for its work under the MSA.  See Coremetrics, Inc.

23  v. Atomic Park.com, LLC, No. C-04-0222 EMC, 2005 WL

24  3310093, at *4 (N.D. Cal. Dec. 7, 2005) (finding

25  unambiguous a clause which stated "In no event shall

26  either party be liable for any indirect, incidental,

27

28

1  special or consequential damages, including without

2  limitation damages for loss of profits . . . .").

3

4       **B.   Cal. Civ. Code Section 1668**

5

6       Peregrine dedicates most of its opposition to

7  arguing that the LOD clauses are unenforceable because

8  they violate California Civil Code Section 1668.[8]

9  (Opp'n at 13-24.)   Section 1668 provides:

10

11          All contracts which have for their
            object, directly or indirectly, to
            exempt anyone from responsibility for

12          his own fraud, or willful injury to
            the person or property of another, or

13          violation of law, whether willful or
            negligent, are against the policy of

14          the law.

15  Cal. Civ. Code § 1668.   Specifically, Peregrine argues

16  that Section 1668 prohibits enforcement of the LOD

17  clauses in the MSA as applied to Peregrine's claims for

18  breach of contract, negligence, negligence per se,

19  negligent misrepresentation/concealment, and

20  constructive fraud.   (Opp'n at 15.)

21  _____

22       [8] Throughout its opposition, Peregrine alternately
    refers to Section 1668 as § 1668 and § 1688.  (See,

23  e.g., Opp'n at 1 ("exculpatory clauses that run afoul
    of California Code of Civil Procedure § 1668 ('section

24  1688')").  The relevant section is in the civil code,
    not the code of civil procedure and is found at section

25  1668.  Similar careless errors can be found throughout
    the Opposition.  (See, e.g., Opp'n at 10 ("section

26  1668"); id. at 12 (alternating between "1668" and
    "1688"); id. at 13 (incorrectly quoting a judicial

27  opinion and including the incorrect section number as
    1688).)  Such errors are distracting, confusing, and

28  misleading to the Court.

19

1    Initially, the Court notes the persuasiveness of

2  CSM's argument in Reply.  (Reply at 5-6.)  Based on the

3  plain language, the Court is skeptical of the

4  applicability of Section 1668 to the claims at issue

5  here.  The statute only applies to contracts "which

6  have for their object, directly or indirectly, to

7  exempt anyone from responsibility . . . ."  Cal. Civ.

8  Code § 1668.  Here, the LOD clauses do not "exempt" CSM

9  from responsibility for any of the causes of action in

10 this litigation.  They merely limit the amounts and

11 types of damages available to Peregrine for these

12 violations.

13    Nevertheless, the Court recognizes that courts

14 applying California law have analyzed damage limitation

15 clauses in light of the restrictions of Section 1668.

16 See Food Safety Net, 209 Cal. App. 4th at 1126-28

17 (applying analysis of § 1668 to clauses nearly

18 identical to those here); Nunes Turfgrass, 200 Cal.

19 App. 3d at 1538; Civic Ctr. Drive Apartments Ltd.

20 P'ship v. Sw. Bell Video Servs., 295 F. Supp. 2d 1091,

21 1105-06 (N.D. Cal. 2003); 1 Witkin, Summary of Cal.

22 Law, Contracts, § 660, 737-38 (10th ed. 2005) ("The

23 present view is that a contract exempting from

24 liability for ordinary negligence is valid where no

25 public interest is involved [] and no statute expressly

26 prohibits it []. [citation omitted] Limitation of

27 liability provisions are valid in similar

28

20

1    circumstances."). <u>But see</u> <u>Farnham v. Superior Court</u>

2    <u>(Sequoia Holdings, Inc.)</u>, 60 Cal. App. 4th 69, 77

3    (1997) ("[A] contract exempting liability for ordinary

4    negligence is valid under some circumstances,

5    notwithstanding the language of section 1668. In our

6    view, it follows that a contractual *limitation* on the

7    liability . . . is equally valid where, as here, the

8    injured party retains his right to seek redress from

9    the corporation.").

10        In <u>Health Net of California, Inc. v. Dep't of</u>

11   <u>Health Servs.</u>, 113 Cal. App. 4th 224 (2003), the court

12   considered a contractual clause prohibiting monetary

13   remedies for non-compliance with laws not expressly

14   incorporated into the contract, but permitting

15   equitable remedies.  <u>Id.</u> at 228-29.  The defendant

16   argued that this provision was not invalid under

17   Section 1668 because the clause is "a limitation on

18   liability and is not a complete exemption."  <u>Id.</u> at

19   239.  The court first noted that "section 1668 has, in

20   fact, been applied to invalidate provisions that merely

21   limit liability."  <u>Id.</u>  Nonetheless, the court went on

22   to find that limiting plaintiff to injunctive relief

23   "surely rises to the level of an 'exemption from

24   responsibility' within the meaning of the plain

25   language of section 1668."[9]  <u>Id.</u>  The court found it

26   _____

27   [9] The Court notes that Peregrine claims that CSM
     caused Peregrine direct damages totaling $20,000,000.

28   (Opp'n at 8.)  According to the evidence submitted,
     (continued . . .)

21

1  necessary to distinguish <u>Farnham</u> and held that "section

2  1668 affords some leeway in the enforcement of

3  exculpatory clauses" and should apply to the situation

4  presented because it involved the public interest and

5  statutory and regulatory violations. <u>Id.</u> at 240-41.

6  Thus, the court applied an analysis under Section 1668

7  to the restriction on available remedies.  <u>See also</u>

8  <u>Pink Dot, Inc. v. Teleport Commc'ns Grp.</u>, 89 Cal. App.

9  4th 407, 415 (2001) (holding that under § 1668 the

10 terms of the contract "could not have precluded

11 liability for . . . gross negligence up to $10,000 in

12 damages[]").

13     Even if on its face the statutory language of

14 Section 1668 does not clearly encompass limitations on

15 liability, California courts have frequently applied

16 the statute's analysis to cases in which the clauses at

17 issue merely limited or capped the remedies available

18 to a plaintiff.  Although the analysis under Section

19 1668 is applicable to damage limitation clauses,

20 "Section 1668 is not strictly applied" and does not per

21

22     _____
          ( . . . continued)
23 Peregrine paid CSM approximately $600,000 for its
   services under the MSA.  (Comp., Exh. G.)  Thus, due to
24 the damages cap in the MSA, Peregrine would be
   foreclosed from recovering $19,400,000 in direct
25 damages.  Peregrine does not quantify its consequential
   damages but argues that CSM's errors substantially
26 delayed FDA approval of bavituximab and cost Peregrine
   at least a six month loss in time to market.  (Opp'n at
27 8.)  Under the LOD clauses, Peregrine would not be able
   to recover for these indirect damages, even if proved.

28
                           22

1   se invalidate limitations on liability as applied to
2   all claims in an action.  See Farnham, 60 Cal. App. 4th
3   at 74.   The Court turns to the issue of whether Section
4   1668 prohibits enforcement of the LOD clauses as
5   applied to Peregrine's claims against CSM.

6
7               1.   **Breach of Contract**
8
9        "With respect to claims for breach of contract,
10  limitation of liability clauses are enforceable unless
11  they are unconscionable, that is, the improper result
12  of unequal bargaining power or contrary to public
13  policy." Food Safety Net, 209 Cal. App. 4th at 1126
14  (applying section 1668); Civic Ctr. Drive Apartments,
15  295 F. Supp. 2d at 1106 (noting that a limitation of
16  liability clause may be enforced where a plaintiff
17  alleges a breach of contract claim unless, in
18  contravention of § 1668, "the provision is
19  unconscionable or otherwise against public policy").
20       Peregrine does not argue that the LOD clauses are
21  unconscionable.  Under California law, a contract
22  provision is unenforceable due to unconscionability
23  only if it is both procedurally and substantively
24  unconscionable, but the elements need not be present in
25  the same degree.  Shroyer v. New Cingular Wireless
26  Servs., Inc., 498 F.3d 976, 981 (9th Cir. 2007).  Here,
27  there is no evidence of procedural unconscionability,
28

as CSM admits that the MSA was not presented on a take-it-or-leave-it basis (SUF ¶ 6; SGI ¶ 6), the parties negotiated the terms of the contract (SUF ¶ 10; SGI ¶ 10), and there is no evidence of unequal bargaining power.  Moreover, clauses limiting damages generally are not substantively unconscionable.  See Simulados Software, Ltd. v. Photon Infotech Private, Ltd., No. 5:12-CV-04382-EJD, 2014 WL 1728705, at *4 (N.D. Cal. May 1, 2014) ("Many contracts contain . . . limitation-of-liability clauses and courts have not found these clauses to be substantially unconscionable as a matter of law.  The contract does not, as Simulados argues, prevent Simulados from recovery in the event of a breach.  The limitation-of-liability clause expressly allows for recovery of the total amount received by Photon. As such, the Contract is not unconscionable and not a contract of adhesion.").  Without any evidence of unconscionability, the Court turns to whether the LOD clauses are contrary to public policy.

The California Supreme Court in Tunkl v. Regents of University of California, 60 Cal.2d 92 (1963) provided an outline of the characteristics which mark a contract as involving the public interest under Section 1668:

> [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds

1
2
3
4
5
6
7
8
9
10
11
12

himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

13
14
15
16
17

Id. at 98-101 (footnotes omitted).  Peregrine argues that the MSA and the TOD clauses at issue satisfy the Tunkl characteristics.  (Opp'n at 15-18.)  CSM disagrees.  (Reply at 8-9.)

18
19
20
21
22
23
24
25

Of primary importance to the second and third factors in Tunkl is the classification of the transaction between Peregrine and CSM.  Peregrine characterizes the transaction as one involving essential medical services that are a matter of necessity.  (Opp'n at 17.)  CSM conversely insists that this is a commercial contract for services involving two sophisticated corporations.  (Reply at 6.)

26
27
28

Peregrine relies on Tunkl, Health Net, and Westlake Cmty. Hosp. v. Superior Court, 17 Cal. 3d 465, 480 (1976) to support its position.  However, this case,

1  unlike those cited by Peregrine, does not involve the

2  provision of medical services to the general public.

3  Tunkl and Westlake involved contracts between a patient

4  or doctor and hospital, respectively.  Both courts

5  focused on the fact "[t]hat the services of the

6  hospital to those members of the public who are in

7  special need of the particular skill of its staff and

8  facilities constitute a practical and crucial necessity

9  is hardly open to question."  Tunkl, 60 Cal. 2d at 101;

10 Westlake, 17 Cal. 3d at 480 ("Hospitals . . . provide a

11 service of great importance to both the public and to

12 doctors seeking to use their facilities.").  The MSA

13 did not involve a medical facility and was several

14 steps removed from the provision of health care

15 services to patients.  (See Shan Decl. ¶ 14 (describing

16 that a third-party vendor, Perceptive, directed CSM to

17 distribute doses "to the trial sites, to thereafter be

18 processed by pharmacists and distributed to physicians

19 to administer to the patients in the study").)  Health

20 Net presents a closer case, but remains

21 distinguishable.  There, a health plan provider

22 contracted with the Department of Health Services

23 ("DHS") to be one of two health plans providing managed

24 care services to Medi-Cal patients in a particular

25 county.  However, in violation of a statute, DHS

26 assigned all patients who failed to select a plan to

27 the competing health plan.  The court found the

28

1   transaction affected the public interest because it

2   involved provision of "managed care for Medi-Cal

3   beneficiaries." Health Net, 113 Cal. App. 4th at 238.

4   Comparatively, CSM and Peregrine contracted to provide

5   clinical services, specifically labelling and tracking

6   of drug vials, to trial sites serving 121 patients in

7   the Phase II trial.  Peregrine argues that the clinical

8   trials "are of great importance to the public" and the

9   outcome of the Phase II trial is "a matter of

10  'necessity,' indeed urgency, for certain members of the

11  public."  (Opp'n at 17.)  However, the service at issue

12  here is not provision of clinical trial services to

13  patients, but rather labeling and distribution of drug

14  vials to trial sites.[10]  While the Court recognizes the

15  _____

16      [10] In Gardner v. Downtown Porsche Audi, 180 Cal.
    App. 3d 713 (1986), the court stated that "this element

17  of the Tunkl test appears to boil down to the following
    question: Is the service merely an optional item

18  consumers can do without if they don't want to waive
    their rights to recover for negligence or is it

19  something they need enough so they have little choice
    if the provider attaches a liability disclaimer?"

20  Gavin W. v. YMCA of Metro. Los Angeles, 106 Cal. App.
    4th 662, 672 (2003) (quoting Gardner, 180 Cal. App. 3d

21  at 718).  Here, CSM's services were clearly optional to
    Peregrine, as Peregrine could have obtained another

22  vendor to perform clinical supply management services.
    Unlike Peregrine, clinical trial patients are not

23  subject to the MSA and did not waive their rights to
    recover for negligence against CSM.  See Philippine

24  Airlines, Inc. v. McDonnell Douglas Corp., 189 Cal.
    App. 3d 234, 243 (1987) ("The damage to PAL was

25  economic, and PAL expressly contracted to limit its
    remedies for economic loss. The injured passengers may

26  still seek recovery from MDC should they so choose.");
    Delta Air Lines, Inc. v. Douglas Aircraft Co., 238 Cal.

27  App. 2d 95, 104 (Cal. Ct. App. 1965) ("The upholding of
    the exculpatory clause will not adversely affect rights

28  of future passengers. They are not parties to the
    (continued . . .)

27

1   importance of clinical trials to the safety,
2   effectiveness, and eventual public utilization of
3   curative or therapeutic pharmaceuticals, the Court
4   cannot find that a contract concerning the labeling and
5   distribution of vials used in such a trial of 121
6   patients transforms the contract into one which renders
7   limitation of liability clauses unenforceable under §
8   1668.  See CAZA Drilling (California), Inc. v. TEG Oil
9   & Gas U.S.A., Inc., 142 Cal. App. 4th 453, 469 (2006)
10  ("While the production of oil is of great importance to
11  the public, the drilling of a particular oil well is
12  generally only important to the party who will profit
13  from it.").  Thus, the Court finds that the second
14  Tunkl factor weighs only slightly in favor of
15  implicating the public interest.
16       Turning to the remaining Tunkl factors, the first
17  factor is satisfied because CSM's business of labeling,
18  warehousing, and distributing drugs is regulated by the
19  FDA.[11]  (See Opp'n at 5-6 (citing 21 C.F.R. §§ 210,
20  211).)  The third factor weighs against finding public
21  interest as CSM does not hold itself out as providing
22  services to the public, but only for a small number of
23

24         ( . . . continued)
25  contract and their rights would not be compromised.
    They retain their right to bring a direct action
26  against Douglas for negligence."); see also Cont'l
    Airlines, Inc. v. Goodyear Tire & Rubber Co., 819 F.2d
27  1519, 1527 (9th Cir. 1987).
         [11] CSM does not dispute that its business is
28  regulated by the FDA.

28

1  clinical-stage pharmaceutical corporations.  <u>See</u> <u>CAZA</u>,

2  142 Cal. App. 4th at 469; <u>Appalachian Ins. Co. v.</u>

3  <u>McDonnell Douglas Corp.</u>, 214 Cal. App. 3d 1, 29-30

4  (1989) ("The high price of obtaining the service, in

5  and of itself, precludes nearly all members of the

6  public from obtaining the service. . . . None of the

7  sales were to an individual member of the general

8  public; all were to large, sophisticated commercial and

9  governmental entities.").

10      Most importantly here, the fourth through sixth

11 factors demonstrate the absence of a public interest in

12 this transaction.  Here, it is undisputed that there

13 was no unequal bargaining power, the parties fully

14 negotiated the contract – including revising several

15 provisions of the MSA, and no property was under the

16 control of the CSM.[12]  (<u>See</u> Shan Decl. ¶¶ 12, 14.)

17

18      [12] At the hearing, Peregrine argued that it was
   under the control of CSM because the double-blinded
19 nature of the study meant CSM was "on [its] own" and
   Peregrine was subject to the risk of CSM's careless
20 errors.  (<u>See</u> Shan Decl. ¶ 14 ("Due to the blinded
   nature of the study, Peregrine . . . was dependent on
21 CSM to strictly floor the protocol . . . .").  The
   sixth factor asks the Court to consider whether
22 Peregrine's property was placed under the control of
   CSM and subject to its carelessness.  Like in
23 <u>Appalachian</u>, several parties took control of
   Peregrine's vials after CSM and Peregrine hired a
24 "clinical trial consultant" to coordinate all the
   vendors, including CSM, and oversee their work.  (Shan
25 Decl. ¶ 10.)  Thus, Peregrine has not made the
   requisite showing of control.  <u>See</u> <u>Appalachian Ins. Co.</u>
26 <u>v. McDonnell Douglas Corp.</u>, 214 Cal. App. 3d 1, 31
   (1989) ("Once the satellite was placed in the Space
27 Shuttle, McDonnell Douglas no longer had control; the
   satellite and the PAM were under NASA's control.").

28

29

1  "Although the Supreme Court [in <u>Tunkl</u>] did not

2  specifically exclude contracts between relatively equal

3  business entities from its definition of contracts in

4  the public interest, it is difficult to imagine a

5  situation where a contract of that type would meet more

6  than one or two of the requirements discussed in

7  <u>Tunkl</u>."  <u>CAZA</u>, 142 Cal. App. 4th at 468-69; <u>see</u>

8  <u>Philippine Airlines</u>, 189 Cal. App. 3d at 237

9  ("Commercial entities, such as PAL and MDC, are

10  entitled to contract to limit the liability of one to

11  the other, or otherwise allocate the risk of doing

12  business."); <u>Delta Air Lines, Inc. v. Douglas Aircraft</u>

13  <u>Co.</u>, 238 Cal. App. 2d 95, 102 (1965) ("Perhaps more

14  important, the case at bench involves none of the

15  elements of inequality of bargaining on which the cited

16  cases, and other recent cases of the same sort, have

17  laid their stress."); <u>Reudy v. Clear Channel Outdoors,</u>

18  <u>Inc.</u>, 693 F. Supp. 2d 1091, 1116 (N.D. Cal. 2010),

19  <u>aff'd sub nom.</u> <u>Reudy v. CBS Corp.</u>, 430 F. App'x 568

20  (9th Cir. 2011) (finding no public interest where "the

21  Release in question between Plaintiffs and Defendants

22  was between two business entities with equal bargaining

23  power, and not a consumer and a larger entity").

24  Finally, several California court have held that where

25  the provisions of the contract are negotiable, the

26  exculpatory clause should not be invalidated on public

27  policy grounds.  <u>See</u> <u>Food Safety</u>, 209 Cal. App. 4th at

28

1127; <u>McCarn v. Pac. Bell Directory</u>, 3 Cal. App. 4th
173, 182 (1992) ("The existence of an offer to
negotiate the limits of liability in the preprinted
contract is fatal to plaintiff's public policy claim. .
. . The limitation in Directory's contract was simply
not compulsory-it was negotiable."). Since Peregrine
was free to and did negotiate thirty-one terms of the
MSA, including the LOD clauses, it cannot post facto
seek to invalidate the terms it freely negotiated with
a relatively equal business entity.

Considering all of the <u>Tunkl</u> factors, the Court
concludes that the MSA and the LOD clauses contained
therein are not contrary to public policy.  Only the
first and second factors weigh in favor of invalidating
the limitations clauses, and they are strongly
outweighed by the third through sixth factors.
Accordingly, the LOD clauses apply to the breach of
contract claim and limit Peregrine's damages thereunder
to direct damages in an amount equal to or less than
the payments made to CSM.  (MSA ¶¶ 16.A, 16C.)  <u>See
Food Safety</u>, 209 Cal. App. 4th at 1127 (finding that
clauses similar to those here did not affect the public
interest where the defendant claimed plaintiff failed
to properly conduct a laboratory study of the efficacy
of defendant's food disinfection equipment as required
by their agreement); <u>Cont'l Airlines</u>, 819 F.2d 1519 at
1527 ("[I]t makes little sense in the context of two

large, legally sophisticated companies to invoke the

Tunkl . . . doctrine."); see also Fosson v. Palace

(Waterland) Ltd., 78 F.3d 1448, 1455 (9th Cir.1996)

("[A] clear and unambiguous contractual provision

providing for an exclusive remedy for breach will be

enforced.") (citations omitted).


### 2.   Negligence[13]


Peregrine makes a contractual interpretation

argument specific to its negligence claim.  (Opp'n at

11-12.)  "[T]he law does not look with favor upon

attempts to avoid liability or secure exemption for

one's own negligence, and such provisions are strictly

construed against the person relying upon them."

Burnett v. Chimney Sweep, 123 Cal. App. 4th 1057, 1066

(2004) (quotation omitted).  "'For an agreement to be

construed as precluding liability for 'active' or

'affirmative' negligence, there must be express and

unequivocal language in the agreement which precludes

---

[13] For the first time at the hearing, CSM argued
that under the economic loss rule, Peregrine's tort
claims should be barred because they rely exclusively
on a breach of the contract.  See United Guar. Mortgage
Indem. Co. v. Countrywide Fin. Corp., 660 F. Supp. 2d
1163, 1180 (C.D. Cal. 2009) ("The economic loss rule
generally bars tort claims for contract breaches,
thereby limiting contracting parties to contract
damages.").  Because this argument was raised for the
first time at the hearing, it was untimely and shall
not be considered by the Court.  See Day v. Sears
Holdings Corp., 930 F. Supp. 2d 1146, 1168 n.84 (C.D.
Cal. 2013) (citing cases).

such liability. [citations omitted] An agreement which
seeks to limit generally without mentioning negligence
is construed to shield a party only for passive
negligence, not for active negligence. [Citations.]'"
Id. (quoting Salton Bay Marina, Inc. v. Imperial
Irrigation Dist., 172 Cal. App. 3d 914, 933 (1985)).
Notably, the Burnett court applied this rule to an
exculpatory clause which shielded the defendant from
liability for all property damage or personal injury
and to a damages limitation clause which precluded
payment for lost profits resulting from any cause of
action.  Id. at 1066-67.[14]

Here, neither of the LOD clauses in Paragraph 16
"specifically mention negligence."  Id. at 1066.
Accordingly, barring any evidence to the contrary,
these provisions are construed as shielding CSM from
damages liability "only for passive negligence, not for
active negligence." Salton Bay, 172 Cal. App. 3d at
933; see also Philippine Airlines, 189 Cal. App. 3d at
239 ("There is in the limitation of liability clause no
mention of negligence and the writing must be strictly

_____

[14] At the hearing, CSM argued that this rule applies
only to indemnity clauses.  However, Burnett did not
involve an indemnity clause or any claims for
indemnity.  See Burnett, 123 Cal. App. 4th at 1061
(lessee of commercial space sued lessor for negligence,
breach of contract, and other claims where the lease
shielded lessor from liability for injury or damage and
limited lessor's damages liability); see also CAZA, 142
Cal. App. 4th at 466-67 (applying Burnett to portion of
the contract limiting contract damages and allocating
liability for tort damages).

33

1   construed, with the result that it does not cover

2   defendant's own negligence.") (quotation omitted).

3       This interpretation is confirmed by the intent of

4   the parties as expressed in the negotiations of the

5   MSA.  In the Revised MSA, Peregrine deleted a portion

6   of Paragraph 16.A which could have exempted CSM from

7   liability for "acts of negligence which are not

8   intentional or reckless."  (Revised MSA ¶ 16.A.)[15]  By

9   erasing that phrase, the MSA eliminates any reference

10  to CSM's negligence, making it liable for active

11  negligence.  See Ferrell v. S. Nevada Off-Rd.

12  Enthusiasts, Ltd., 147 Cal. App. 3d 309, 318 (1983)

13  ("We, therefore, conclude that to be effective, an

14  agreement which purports to release, indemnify or

15  exculpate the party who prepared it from liability for

16  that party's own negligence or tortious conduct must be

17  clear, explicit and comprehensible in each of its

18  essential details.").

19      "Whereas passive negligence involves 'mere

20  nonfeasance, such as the failure to discover a

21  dangerous condition or to perform a duty imposed by

22

23  _____

    [15] At the hearing, Peregrine incorrectly argued that
24  the erasure of negligence from Paragraph 16.A applied
    only to CSM's liability for consequential, incidental,
25  special or indirect damages resulting from negligence.
    However, the language of the unamended sentence makes
26  clear that the original version would have exempted CSM
    from any liability for negligence.  (See Revised MSA ¶
27  16.A ("In no event shall CSM . . . be liable for
    consequential, incidental, special, or indirect
28  damages, or for acts of negligence . . . .").)

law,' active negligence involves 'an affirmative act,' knowledge of or acquiescence in negligent conduct, or failure to perform specific duties." <u>Frittelli, Inc. v. 350 N. Canon Drive, LP</u>, 202 Cal. App. 4th 35, 48 (2011) (quotation omitted).  The facts put forth in the SGI raise a triable issue of fact as to whether CSM was actively negligent in failing to perform the specific duties under the MSA and Work Orders.

The cases relied upon by CSM – which enforced liability limitation clauses against negligence claims – all included contractual provisions which expressly and unequivocally stated the parties' intent to limit liability for negligence.  <u>See</u> <u>Food Safety</u>, 209 Cal. App. 4th at 1126-27; <u>CAZA</u>, 142 Cal. App. 4th at 466-67; <u>Markborough California, Inc. v. Superior Court</u>, 227 Cal. App. 3d 705, 709 (1991); <u>Nat'l Rural Telecommunications</u>, 319 F. Supp. 2d at 1047.  Because there is no similar expression of contractual intent in the MSA, the Court finds that the LOD clauses leave CSM open to unlimited liability for active negligence.

The question remains then whether Section 1668 bars the damages limits in the LOD clauses as applied to CSM's passive negligence, if proved.  Like with the breach of contract claim, "a contract exempting from liability for ordinary negligence is valid where no public interest is involved . . . and no statute expressly prohibits it . . . ."  <u>Blankenheim v. E. F.</u>

1   <u>Hutton & Co.</u>, 217 Cal. App. 3d 1463, 1472 (1990)

2   (quotation omitted); <u>Frittelli</u>, 202 Cal. App. 4th at

3   43.   As discussed above, the MSA and LOD clauses do not

4   implicate the public interest.   Other than Section

5   1668, CSM does not present the Court with any statute

6   which invalidates the limitation on damages for

7   negligence.   Accordingly, the LOD clauses apply to

8   Peregrine's claims for passive negligence and limit its

9   recovery in accordance therewith.[16]

10

11        **3.   Negligence Per Se**

12

13        Section 1668 bars as against public policy "[a]ll

14   contracts which have for their object, directly or

15   _____

16   [16] At the hearing, the parties discussed whether
     Peregrine's claims for gross negligence, subsumed under
17   its negligence claim, would survive.   Certainly if the
     language of the TOD clauses does not encompass
18   affirmative negligence, it also could not reach gross
     negligence.   See Wallace v. Busch Entm't Corp., 837 F.
19   Supp. 2d 1093, 1101 (S.D. Cal. 2011) ("Gross negligence
     is different from ordinary negligence in that ordinary
20   negligence 'consists of a failure to exercise the
     degree of care in a given situation that a reasonable
21   person under similar circumstances would employ to
     protect others from harm,' whereas gross negligence
22   requires 'a want of even scant care or an extreme
     departure from the ordinary standard of conduct.'")
23   (quotation omitted).   In any event, limitations on
     liability for gross negligence are generally
24   unenforceable.   See City of Santa Barbara v. Superior
     Court, 41 Cal. 4th 747 (2007) (holding an agreement
25   purporting to release liability for future gross
     negligence unenforceable as a matter of public policy);
26   Rosencrans v. Dover Images, Ltd., 192 Cal. App. 4th
     1072, 1081 (2011) ("[W]hile plaintiffs' claims for
27   ordinary negligence are barred by the Release, their
     claim for gross negligence would not be barred by the
28   Release due to public policy concerns.").

1   indirectly, to exempt anyone from responsibility for .
2   . . violation of law, whether willful or negligent . .
3   . .”  Cal. Civ. Code § 1668.  Relying on this portion
4   of the statute, Peregrine argues that the LOD clauses
5   do not apply to its cause of action for negligence per
6   se, as it incorporates violations of law.  (Opp'n at
7   18-20.)  Specifically, Peregrine claims CSM violated
8   several FDA regulations contained in 21 C.F.R. §§
9   211.125, 211.130, 211.142, and 211-150.  (FAC ¶¶ 14,
10  19, 33.)  CSM does not dispute that its alleged conduct
11  violated FDA regulations or that these regulations
12  constitute “violation[s] of law” under Section 1668.
13  See Health Net, 113 Cal. App. 4th at 234 (“The
14  statute's prohibition against contractual provisions
15  that exculpate violations of statutory law has also
16  been construed to include regulatory violations.”).[17]
17  The only issue to be decided is whether the LOD
18  provisions are invalid under Section 1668 as applied to
19  Peregrine's negligence per se claims.

20

21

_____

22   [17] As opposed to claims for active negligence, the
Court was unable to find and the parties have not
23   identified any case where the court required express
and unequivocal language limiting liability for
24   negligence per se.  Cf. Burnett, 123 Cal. App. 4th at
1066.  The Court finds negligence per se claims more
25   closely resemble passive negligence, which involves
“mere nonfeasance, such as the failure . . . to perform
26   a duty imposed by law.”  Frittelli, 202 Cal. App. 4th
at 48.  Accordingly, like passive negligence, the LOD
27   clauses need not expressly state their intent to apply
to negligence per se claims in order for the damages
28   limitations to apply.

1    There is a split in the case law regarding whether
2  a party can limit its liability for negligent
3  violations of statutory law.  See Morris v. Zusman, 857
4  F. Supp. 2d 1082, 1094 (D. Or. 2012) (examining
5  California law and stating "[t]here appears to be a
6  degree of ambiguity in the case law construing Section
7  1668 as to whether the statute operates to void
8  contractual provisions which do not entirely exculpate
9  statutory violations . . . , but purport instead merely
10  to limit the money damages available to an aggrieved
11  party arising out of such violations or conduct.").
12  Peregrine relies on Health Net, 113 Cal. App. 4th at
13  234 and Capri v. L.A. Fitness Int'l, LLC, 136 Cal. App.
14  4th 1078, 1084 (2006), for the proposition that "[i]t
15  is now settled—and in full accord with the language of
16  the statute—that notwithstanding its different
17  treatment of ordinary negligence, under section 1668,
18  'a party [cannot] contract away liability for his
19  fraudulent or intentional acts or for his negligent
20  violations of statutory law,' regardless of whether the
21  public interest is affected." Health Net, 113 Cal.
22  App. 4th at 234 (citations omitted); Capri, 136 Cal.
23  App. 4th at 1084.  However, as the Court previously
24  discussed, here, CSM did not contract away its
25  liability for regulatory violations, it merely limited
26  its liability for damages resulting from those
27  violations.  Making this point, CSM cites CAZA, 142
28

Cal. App. 4th at 472, and <u>Farnham</u>, 60 Cal. App. 4th at 74, which uphold "contractual limitations on liability, even against claims that the breaching party violated a law or regulation." <u>CAZA</u>, 142 Cal. App. 4th at 472.

As applied to this action, the Court finds the later line of cases more persuasive. Peregrine's cases are largely distinguishable. As the <u>CAZA</u> court recognized, "<u>Capri</u> is significantly different from the present case because it involved personal injury to a consumer. Here, the contract was between two business entities and the damages claimed are entirely economic." <u>CAZA</u>, 142 Cal. App. 4th at 471. In <u>Health Net</u>, the court found that a clause which prohibits "any liability for *any* damages for *any* statutory violation surely rises to the level of an 'exempt[ion] from responsibility' within the meaning of the plain language of section 1668," but left open the possibility that "some contractual limitations over the scope of available remedies need not necessarily run afoul of section 1668." <u>Health Net</u>, 113 Cal. App. 4th at 239. The LOD clauses do not rise to the level of exemption described in <u>Health Net</u>. CSM remains liable for direct damages in an amount equal to the sum it received from Peregrine. <u>See</u> <u>Morris</u>, 857 F. Supp. 2d at 1096 (synopsizing the <u>Health Net</u> rule as: "any limitation of liability that, while facially falling short of an absolute elimination of liability, would

1   nevertheless be unenforceable under Section 1668 to the

2   extent that it so limited the money damages available

3   as to constitute a *de facto* exemption from

4   responsibility for intentional misconduct or violation

5   of statutory law"). Moreover, unlike in Health Net,

6   the Court found that the transaction at issue does not

7   affect the public interest. Id. at 241.

8       By comparison, in CAZA, TEG hired CAZA to drill a

9   well and executed a contract that excluded

10  consequential damages and allocated liability for tort

11  damages caused by negligence. 142 Cal. App. 4th at

12  457, 466. A few days after drilling began, there was a

13  blowout, resulting in the death of a CAZA employee,

14  injury to others, and complete destruction of the well.

15  CAZA filed a complaint against TEG, alleging breach of

16  contract and other causes of action. Id. at 458. TEG

17  filed a cross-complaint contending that CAZA was liable

18  for negligence per se because it violated various

19  statues and regulations in performing drilling

20  activities. Id. at 470. The CAZA court reviewed

21  numerous California cases and held that the challenged

22  provisions "represent[] a valid limitation on liability

23  rather than an improper attempt to exempt a contracting

24  party from responsibility for violation of law within

25  the meaning of section 1668." Id. at 475. The court

26  stated:

27          CAZA did not seek or obtain complete
            exemption from culpability on account
28          of its potential negligence or

                              40

violation of any applicable
regulations. It merely sought to limit
its liability for economic harm
suffered by TEG. The parties foresaw
the possibility that a blowout could
occur and agreed between themselves
concerning where the losses would
fall. . . . [T]he limitation of
liability provisions did not adversely
affect the public or the workers
employed by CAZA. . . . [W]here the
only question is which of two equal
bargainers should bear the risk of
economic loss in the event of a
particular mishap, there is no reason
for the courts to intervene and remake
the parties' agreement.

CAZA, 142 Cal. App. 4th at 475.  Similarly here, the

LOD provisions merely limit CSM's liability for

economic harm.   The MSA reveals that the parties

foresaw the centrality of the FDA regulations and CSM's

compliance with professional standards.  (See MSA ¶¶

3A, 15.)   The LOD clauses do not adversely affect the

patients in the Phase II trial or the general public.

Peregrine and CSM, two equal bargainers, apportioned

the risk for violations of law in the MSA , and the

Court shall not disturb the parties' agreement.   See

Farnham, 60 Cal. App. 4th at 78 ("[T]he "sole remedy"

provision[, which preserved an employee's claims

against his corporate employer but waived his right to

sue the corporation's officers,] in Farnham's contract

does not conflict with any public interest but is

instead the result of a private, voluntary transaction

in which Farnham simply agreed to look to Sequoia to

shoulder a risk that might otherwise have fallen on its

41

officers, directors and shareholders."); <u>Morris</u>, 857 F.
Supp. 2d at 1097 ("[N]egotiated agreements to cap
available money damages at reasonable levels would not
be within the scope of [Section 1668]."); <u>Reudy</u>, 693 F.
Supp. 2d at 1118 (applying CAZA and stating "Presumably
two business entities with equal bargaining power
should be able to voluntarily enter into a Release
Agreement whereby one pays the other in order to
continue its' allegedly wrongful conduct. . . . This
does not appear to . . . be the sort of Agreement that
was meant to run afoul of Section 1668, and is clearly
distinguishable from the facts of the cases cited by
Plaintiffs in which the parties signed broad contracts
releasing new, unknown and unspecified wrongdoing that
might happen in the future[.]").

   Relying on these cases, the Court finds that
Section 1668 does not invalidate the LOD clauses as
applied to CSM's alleged violations of law used to
support Peregrine's claim for negligence per se.  The
Court holds that the damages caps in Paragraph 16 apply
to this claim.


   **4.  Fraud**


   Finally, the FAC includes two fraud claims for
negligent misrepresentation and constructive fraud.
<u>See</u> <u>Blankenheim</u>, 217 Cal. App. 3d at 1472-73 ("[C]ase

1   law has long held that negligent misrepresentation is
2   included within the definition of fraud."); Cal. Civ.
3   Code § 1573.

4        Unlike claims involving negligent violations of law
5   under Section 1668, there is no split in the caselaw
6   regarding intentional torts.  The cases uniformly hold
7   that "limitation of liability clauses are ineffective
8   with respect to claims for fraud and
9   misrepresentation," regardless of whether the public
10  interest is implicated.  <u>Food Safety</u>, 209 Cal. App. 4th
11  at 1126; <u>Blankenheim</u>, 217 Cal. App. 3d at 1471-1473.

12       None of the cases cited by CSM uphold the
13  application of a liability limitation clause to a fraud
14  claim, even where the clause amounts to a limitation on
15  damages limitations as opposed to an outright
16  exemption.  <u>See</u> <u>Farnham</u>, 60 Cal. App. 4th at 71
17  ("[C]ontractual releases of future liability for fraud
18  and other intentional wrongs are invariably
19  invalidated."); <u>Civic Ctr. Drive</u>, 295 F. Supp. 2d at
20  1106 ("Under § 1668 of the California Civil Code,
21  contracts which 'have for their object . . . to exempt
22  any one from responsibility for his own fraud . . . are
23  against the policy of the law.'") (quotation omitted).

24       In accordance with the precedent, the Court holds
25  that the LOD clauses are inapplicable to Peregrine's
26  claims for negligent misrepresentation and constructive
27  fraud.  <u>See</u> <u>WeBoost Media S.R.L. v. LookSmart Ltd.</u>, No.
28

1  C 13-5304 SC, 2014 WL 2621465, at *9-10 (N.D. Cal. June

2  12, 2014) (holding that "section 1668 renders the T &

3  C's limitation of liability unenforceable to the extent

4  that it would insulate Defendant from intentional tort

5  liability" where the clauses at issue, like those here,

6  barred consequential damages and limited liability to

7  "the total amount paid . . . to Defendant under this

8  Agreement," but did exculpate liability for the claims

9  at issue).

10

11            **V.   CONCLUSION**

12

13      For the foregoing reasons, the Court GRANTS IN PART

14  and DENIES IN PART Defendant's motion for partial

15  summary judgment.  The Court holds that the Limitations

16  on Damages clauses in Paragraph 16 of the Master

17  Services Agreement apply to the FAC's causes of action

18  for breach of contract, passive negligence, and

19  negligence per se.  The damages limitations do not

20  apply to the claims in the FAC for active negligence,

21  negligent misrepresentation, and constructive fraud.

22

23

24

25  Dated: July 30, 2014

26                    Jesus G. Bernal

27              United States District Judge

28

                        44